**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**JAMES SANDERS,**

      **Petitioner,**

**vs.**                               **Case No. 4:07cv206-RH/WCS**

**JAMES R. McDONOUGH,**

      **Respondent.**

_____/


**REPORT AND RECOMMENDATION TO DENY § 2254 PETITION**

Petitioner filed a 28 U.S.C. § 2254 petition for writ of habeas corpus.  Doc. 1.

Respondent filed an answer and relevant portions of the state court record.  Doc. 10.

Petitioner filed a traverse with exhibits.  Doc. 13.  Pursuant to court order, doc. 14,

Respondent filed a supplement to the response and Petitioner filed a traverse to the

supplement.  Docs. 19 and 21.

References to exhibits are to those filed by Respondent unless otherwise noted.

Exs. A-KK was filed in paper form as an attachment to doc. 10.  *See* doc. 10 (list of

exhibits), pp. 37-39 (as scanned in the electronic case filing system, ECF).  Ex. LL was

filed electronically as an attachment to doc. 19 (the attachment appearing as doc. 19-2 in ECF).

**Procedural Background**

The procedural history was set forth by Respondent in the answer, and Petitioner agrees with that portion of the answer. Doc. 10, pp. 1-5; doc. 13, p. 1. It was summarized in the undersigned's order of February 29, 2008. Doc. 14. Some of that order is repeated here for the convenience of the district judge; the order is otherwise incorporated herein by reference.

Briefly, while already in Florida Department of Corrections (DOC) custody, Petitioner was charged with one count of bribery and one count of possession of contraband (the currency used for the alleged bribe) at a correctional facility. Doc. 10, p. 1. As set forth in more detail ahead, Petitioner was initially represented by Assistant Public Defender Jamie Spivey. Petitioner filed a pro se motion to discharge counsel, and a hearing was held on January 17, 2001. Ex. A, pp. 8-12 (motion), pp. 53-80 (transcript). At the hearing it was determined that there may have been some communication problems, and the court thought it prudent to continue the trial to allow counsel more time to investigate and prepare. Ex. A, pp. 72-78; *see also* Ex. C, p. 1 (initial brief on appeal). Though the motion to discharge Spivey was not granted, Assistant Public Defender Kevin Steiger wrote a letter to Petitioner on February 19, 2002, advising that Spivey would no longer be his counsel as Steiger had assumed his caseload. Ex. A, p. 131 (pp. 131-160 are attachments to Petitioner's second motion to discharge counsel). Petitioner wrote Steiger a letter on February 27, 2002, discussing, *inter alia*, speedy trial, a possible entrapment defense, and asking Steiger if he had a

conflict of interest since he and Spivey were both employed by the Public Defender.  Ex. A, pp. 132-135.

Steiger responded that he had discussed the situation with Public Defender Nancy Daniels, and "will file a motion to withdraw as counsel."  *Id.*, p. 136.  He advised that it would be up to the judge, "[h]e may decide to grant the motion to let me withdraw or he may order that I continue in my office's representation of you.  In my opinion, he will probably do the latter."  *Id.*

He addressed Petitioner's concerns regarding the entrapment defense.  He said that admission to possession of the money would not affect a judgment of acquittal argument, that the State would prevail anyway based on Messer's testimony, which established a prima facie case.  *Id.*  Steiger said that lack of predisposition would be provided by Petitioner's own testimony, based on Petitioner's representations to counsel in their last conversation.  *Id.*  He was investigating Messer's record, and provided Petitioner with the discovery he had obtained so far.  *Id.*, pp. 136-137.

Counsel wrote:

You told me that Officer Messer had, in fact, entrapped you.  You also stated, once I spoke with you that your did not need a copy of the tape from Messer's body bug.  We had agreed that the entrapment defense was a much stronger defense than the "they're all lying on me" defense.  It allowed us to try and get in Messer's prior misconduct and focus our energy on the State's weakest link, Officer Messer.

Our argument is the other cops were taken advantage of as well as you by one bad guard.  It is a strong defense in that it is much more believable than some sort of conspiracy theory, and, based on what you have told me, it is the truth.  In my experience, in 14 years of being a trial lawyer, jurors are much more willing to believe one person is lying rather than a bunch, particularly if the bunch happen to be law enforcement officers.  Arguing all the cops are lying, on the word of a bunch of convicted felons is pretty much a non-starter.  One inmate, taken advantage of and set up

by a dirty cop, has a great deal of jury appeal.  Focus your energy on the battle you can win, rather than the ones you are sure to lose, like a JOA argument related to some idea that the Judge won't believe Messer that he got the money from you.  That is doomed from the outset.  As I said before, credibility is not an issue during a JOA argument.

My advice, as your attorney who is Board Certified by [T]he Florida Bar in Criminal Trial Law, is to go with the entrapment defense.  It will require you to take the stand.  I cannot promise you will be acquitted, but in my opinion, you've got a lot better chance than if you go with what seems to be your defense that Messer is lying about getting the money from you and all those other cops that say they saw it are willing to commit perjury to get you convicted.  You are working against the weight of the evidence.  As I said before, I will be doing a motion to withdraw and let the Judge decide whether there is a conflict of interest in my further representation.  I doubt the Judge will grant it but feel free to make any arguments you wish to make at the hearing.  You are correct that I will not be providing advice on how to attack Mr. Spivey's representation as ineffective.

Ex. A, pp. 137-138.

Steiger filed a motion to withdraw "on the grounds that said Defendant believes there is an ongoing conflict of interest related to the further representation of the Defendant by this office." *Id.*, p. 139 (motion dated March 7, 2002) (also appears at pp. 31, 39).  A motion hearing was held on March 14, 2002.  Ex. A, pp. 249-259 (transcript). The court said that an ineffective assistance of counsel claim as to Spivey "is a non-issue.  That doesn't even come up unless sometime after there is a conviction or some kind of post trial motion.  I don't deal with that.  That's water under the bridge.  The question is, are we ready to go to trial?"  *Id.*, pp. 253-254.  Counsel said he was not ready as there were three depositions (originally set, cancelled, then never rescheduled by Spivey) he needed to take.  *Id.*, p. 254-255.  Pretrial was set for May 9 with trial to start May 14, with counsel to seek a continuance if needed.  *Id.*, p. 257.

Trial was continued.  Defense counsel sought and was granted appointment of an expert to test the authenticity of the audiotape to see if there had been any tampering with the tape.  *Id.*, pp. 88-90 (copy of motion), 107 (order of June 11, 2002).[1] Petitioner filed a second pro se motion to discharge counsel dated July 23, 2002.  *Id.*, pp. 121-160 (motion and exhibits A-Q).[2]  This was the date of trial.  A hearing was held on the motion before jury selection commenced.  Ex. B, pp. 4-22.  The court said "the speedy trial thing is not ineffective for not making it because it wasn't about to be granted."  *Id.*, p. 20.  And whether or not Spivey was ineffective was irrelevant at the trial level, the court advised that all it meant was that Petitioner got another attorney. *Id.*, p. 21.  In response to Petitioner's claim that he was in a position of not being able to pursue ineffectiveness, the court explained "what I'm saying is you couldn't pursue that with any attorney," that if he hired his own attorney to raise it still the only remedy the court could give him at trial was a new lawyer.  *Id.*, p. 22.  The court said there were "logistical problems in your defense, but it's nothing that raises to the level of ineffective assistance of counsel," and denied the motion for discharge.  *Id.*

The theory of the defense, as set forth in opening and closing argument, was entrapment.  Ex. B, pp. 50-53, 206-216.

---

[1] No indication of tampering was found.  Ex. B, p. 18.

[2] Petitioner said he "asked Mr. Steiger to address the probable conflict between his office and the defendant during the direct appeal representation," and Steiger advised that his office would represent him as to any appellate issues except ineffective assistance of counsel.  *Id.*, p. 124, referencing Exs. E-H.  In his motion, Petitioner cited the right to effective assistance of counsel free from actual conflict of interest.  *Id.*, pp. 125-127.

Petitioner was found guilty of both counts by a jury, and sentenced to 185 months to be served concurrently with the sentence he was serving at the time of the offenses.  Ex. A, pp. 163-164.  He filed an appeal, and the judgment was affirmed without opinion.  Ex. F.

Petitioner filed a petition for writ of habeas corpus in state court claiming ineffective assistance of appellate counsel, and the petition was denied on the merits.  Exs. G and K.  He filed a second petition for writ of habeas corpus in state court claiming ineffective assistance of appellate counsel (with different supporting allegations), which was denied as a second or successive petition.  Exs. L and P.

Petitioner filed a motion to correct illegal sentence pursuant to FLA. RULE CRIM. P. 3.800(a), claiming his sentence exceeded the statutory maximum; the motion was denied.  Ex. Q (record on 3.800 appeal).  Denial was affirmed without opinion on appeal.  Ex. S.

Petitioner next filed a FLA. RULE CRIM. P. 3.850 motion, asserting a number of instances of ineffective assistance of trial counsel.  Ex. U (record on 3.850 appeal).  The motion was denied as successive since Petitioner had raised these claims by petition for writ of habeas corpus.  Ex. U, pp. 249-250.

Petitioner sought and was ultimately granted a belated appeal from the order denying Rule 3.850 relief.  Exs. V, X, and CC.  *Id.*, pp. 4-5.  The state was directed to and did respond to one of the ineffectiveness of counsel claims.  Exs. FF and GG.  The denial of 3.850 relief was affirmed without opinion, and rehearing was denied.  Exs. HH, JJ and KK.

Petitioner then filed the § 2254 petition.  Respondent concedes the petition was timely filed.  Doc. 10, pp. 5-10.

**Standards Governing § 2254 Petitions**

Habeas corpus relief may be denied on the merits notwithstanding the failure of the petitioner to exhaust state remedies.  § 2254(b)(2).[3]  But habeas corpus relief may be granted only if Petitioner has properly exhausted his federal claims in state court.  § 2254(b)(1) and (c).  To do so the federal claim be fairly presented to the state court, to give the State the opportunity to pass upon and correct alleged violations of federal rights.  *See* Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004) (citations omitted); Duncan v. Henry, 513 U.S. 364, 365-366, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995).  While it is not necessary that the petitioner cite "book and verse" of the Constitution, the state court must be alerted to the fact that a federal constitutional claim is raised.  Duncan, 513 U.S. at 365-366, 115 S.Ct. at 888 (citations omitted); *see also* McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding that a petitioner must "do more than scatter some makeshift needles in the haystack of the state court record) (citations omitted).

The petitioner also "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying

---

[3] If no constitutional claims are raised then §2254 is inapplicable, and the exhaustion inquiry is irrelevant.  Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct. 1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

this one complete round requirement to state collateral review process as well as direct

appeal).  If a claim is not fairly presented through one complete round of state court

review and review is no longer available in state court, it is procedurally defaulted and

the petitioner must demonstrate cause and prejudice for the default *or* a miscarriage of

justice.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640

(1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113

L.Ed.2d 517 (1991).[4]

    As previously explained, the procedural default rule "is grounded in the

independent and adequate state law doctrine."  Doc. 14, p. 4, quoting Parker v.

Secretary, Department of Corrections, 331 F.3d 764, 770-771 (11th Cir. 2003), *cert.*

*denied*, 540 U.S. 1222 (2004) (citing Coleman, other citation omitted).  This court noted

that, with the exception of conflict of interest, Respondent did not assert procedural bar

as to Petitioner's ineffective assistance of trial counsel claims, "apparently conceding"

that dismissal of these claims was not based on an independent and adequate state

procedural ground.  Doc. 14, pp. 4-5 and n. 2.  The court addresses the procedural bar

argument ahead with respect to that claim.

    For a claim fairly presented and adjudicated on the merits in state court, and

pursued through one complete round of the review process, Petitioner must show that

the state court's adjudication "was contrary to, or involved an unreasonable application

---

    [4] The miscarriage of justice exception applies only to extraordinary cases, where
a constitutional violation has probably resulted in conviction of an innocent person.
McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517
(1991). *See also* House v. Bell, 547 U.S. 518, __, 126 S.Ct. 2064, 2076-77, 165 L.Ed.2d
1 (2006) (explaining what must be shown to demonstrate actual innocence as a
"gateway" to review of a defaulted claim).

of, clearly established Federal law, as determined by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1) and (2); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146  L.Ed.2d 389 (2000).  Only adjudication of the merits, not an explanation or written opinion, is necessary for this deference to apply.  Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) ("all that is required is a rejection of the claim on the merits, not an explanation."); Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 776 (11th Cir. 2003) (same); Herring v. Sec'y for the Dep't of Corr., 397 F.3d 1338, 1347 (11th Cir.), *cert. denied*, 546 U.S. 928 (2005) ("[e]ven a summary, unexplicated rejection of a federal claim qualifies as an adjudication entitled to deference under § 2254(d)." ).

If Petitioner can show that the state court's adjudication satisfies § 2254(d)(1) or (2), then this court reviews the federal claim on the merits, without the deference otherwise required.  Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858-59, 168 L.Ed.2d 662 (2007); Jones v. Walker, 496 F.3d 1216, 1228 (11th Cir. 2007) (citing Panetti).

**Ground One**

Petitioner asserts that he was denied a fair trial by the denial of a continuance when new counsel was appointed shortly before trial, and witnesses who would have corroborated an entrapment defense were discovered just the weekend before trial. Doc. 1, p. 4-4A.

Respondent argues that, to the extent this is even a federal claim, Petitioner did not exhaust a federal claim in state court.  Doc. 10, pp. 12-14.

The morning of jury selection, defense counsel moved for continuance based on newly discovered witnesses, but was denied.  Ex. C (appellate brief), p. 2.  Petitioner argued on appeal that denial of a continuance "was error, because it deprived Mr. Sanders of fully litigating his defense of entrapment."  *Id.*, p. 8.  He argued that the trial court abused its discretion in denying the motion to continue trial.  *Id.*, p. 9.  Petitioner argued that the issue was whether he was entrapped into giving the $100 bill to Officer Messer, so it was important to explore prior contacts between Petitioner and Messer. *Id.*, p. 15.  The appellate brief quoted from the transcript.  There, counsel explained that his investigator had spoken to inmates on Thursday the week before and they told him "it's not what it seems and gave us information that would definitely help us in an entrapment defense," and counsel told Petitioner, who changed the subject.  *Id.*, pp. 11-12.  On the morning of trial, Petitioner advised counsel that he *did* want to use those witnesses, and came up with more witnesses.  *Id.*, p. 12.  Based on what the witnesses told the investigator, counsel said the inmates would testify "that there was an ongoing business between Mr. Messer and my client where Mr. Messer transported marijuana into the facility to my client and a number of other people and those witnesses are willing to testify to that."  *Id.*

The trial court thought that Petitioner knew about this before, but Petitioner claimed that it was a surprise to him that the people in prison were actually willing to testify.  *Id.*, p. 13.  Petitioner had not mentioned the marijuana to counsel, though he had told counsel about Messer doing him favors, and bringing him vodka and snuff.  *Id.*, pp. 13-14.  The court did not know that this evidence would really help him, but even if it would, Petitioner knew about it some time ago.  *Id.*, p. 14.  The court understood that

finding out the other inmates were willing to testify would "shine a new light" on Petitioner's situation, but this was not enough to grant a continuance.  *Id.*, p. 15.

Petitioner's argument on appeal was that the defense was not given the opportunity to explore information discovered the Thursday before trial, and denial of a continuance "went to the heart of Mr. Sanders' defense."  *Id.*, p. 15.  Counsel argued that Petitioner would certainly lose in a swearing match with a prison guard, absent corroboration, and denial of a continuance denied the opportunity to obtain corroboration.  *Id.*, p. 16.

> Petitioner's appellate counsel argued:
>
> In Brown v. State, 426 So.2d 76, 80-81 (Fla. 1st DCA 1983), the State hypnotically refreshed the memory of a key witness who had identified Ms. Brown as the person who cashed the check at the bank.  Defense counsel did not learn of the use of hypnotists until the Friday before the trial the following Tuesday.  This Court held that "due process demands that counsel be afforded a fairer means by which to prepare his defense to this critical evidence."[5]
>
> So it was for Mr. Sanders.  See Harley v. State, 407 So.2d 382 (Fla. 1st DCA 1981); Brooks v. State, 176 So.2d 1965).

Ex. C, p. 16.

The answer brief did not address this allegation of a due process violation *or* claim that it had been procedurally defaulted.  Ex. D.  It was argued that denial of a motion for continuance is reviewed for abuse of discretion, and set forth the four elements required for a continuance.  *Id.*, pp. 6-7.  Of the four elements, it was argued that Petitioner failed to show three (prior due diligence, that the witnesses were

---

[5] Hypnotically recalled testimony was later deemed unreliable and inadmissible in Florida.  Bundy v. State, 471 So.2d 9 (Fla. 1985).

available and willing to testify, and that denial of a continuance caused material prejudice).  *Id.*, p. 7-10.  It was noted that Petitioner "failed to specifically identify any witness that he claimed would testify;" generically referencing witnesses but "without identifying any one witness who would actually testify."  *Id.*, p. 9.  The judgment was affirmed without opinion.  Ex. E.

If Petitioner fairly presented the federal claim by raising it on appeal, then the claim would be properly exhausted but the state court's adjudication (without opinion) would be reviewed with the deference required under § 2254(d).  If Petitioner did *not* fairly present a constitutional claim then it is procedurally barred, and not subject to review absent a showing of cause and actual prejudice.  And, as previously noted, this court can deny relief on the merits notwithstanding the failure to exhaust.

Denial of a continuance rises to the level of a constitutional violation only if it is so arbitrary as to violate due process.  <u>Morris v. Slappy</u>, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).  <u>Alderman v. Zant</u>, 22 F.3d 1541 (11th Cir.), *cert. denied*, 513 U.S. 1061 (1994).  "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel."  461 U.S. at 11, 103 S.Ct. at 1616 (citation omitted).  "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel."  *Id.*, at 11-12, 103 S.Ct. at 1616 (citation omitted).  *See also* <u>Hicks v. Wainwright</u>, 633 F.2d 1146, 1148 (5th Cir. 1981) (in habeas corpus context, "not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process.")

(citations omitted);[6] Dickerson v. State of Alabama, 667 F.2d 1364, 1370 (11th Cir.),

*cert. denied*, 459 U.S. 878 (1982) (in habeas context, noting the factors to be

considered in determining whether accused was deprived the constitutional right to

compulsory process by denial of continuance, quoting Hicks).[7]

To demonstrate that the state court's denial of a continuance violated due

process, Petitioner must demonstrate "first, that the trial court abused its discretion and,

second, that its action rendered the petitioner's trial fundamentally unfair."  Conner v.

Bowen, 842 F.2d 279, 283 (11th Cir.), *cert. denied*, 488 U.S. 840 (1988) (citation and

footnote omitted).  For abuse of discretion, the court looks to the record before the state

court when the decision was made and whether the state court should have concluded

(based on that record) that denial of a continuance would probably deny a fair trial.  *Id.*

To determine whether the trial was fundamentally unfair, the court looks for actual

prejudice.  *Id.* (citation and footnote omitted).[8]  "[R]efusal to grant a continuance may

have impeded the petitioner's ability to investigate the case, confront the prosecution's

---

[6] In Hicks, denial of a continuance to the next day, to obtain the testimony of a
doctor – who could not testify earlier through no fault of defendant – that the defendant
was insane, "effectively stripped him of any defense he might have had."  *Id.*, at 1150.

[7] The "several factors" include due diligence of the defense, probability of
procuring testimony within a reasonable time, specificity with which defense can
describe anticipated testimony, degree to which testimony would be favorable to
defense, and the unique or cumulative nature of the testimony.  667 F.3d at 1370
(quoting Hicks, other citation omitted).

[8] In the footnote it was noted that prejudice might be presumed in some cases;
for example, if the petitioner had been arrested, charged, and tried in the same day.  *Id.*,
n. 12.  In that case, however, the petitioner had three months' notice of the charges, and
counsel had five weeks to investigate the case.  *Id.*

evidence, and present a defense, thus affecting the integrity of the guilt determination," and this would constitute prejudice.  *Id.*[9]

Petitioner has not shown any abuse of discretion or that his trial was rendered fundamentally unfair.  Petitioner obviously knew of his own prior dealings with Messer.  Though a continuance was denied, he had personal knowledge and was competent to testify to these alleged prior dealings.  He did testify, but not as to any involvement with Messer in bringing marijuana into the facility.  It is not clear whether such testimony (by himself or anyone else) would have been admissible or relevant to the entrapment defense, and (if so) whether it might have helped him.  Petitioner's argument to the jury was that he was entrapped, that the exchange of money was brought about by Messer, and he did not want to get involved.  Ex. B, pp. 206-215 (defense counsel's closing argument).  His position was that Messer was not credible, that neither Messer nor his brother (also a DOC officer) was a "clean" officer, and setting up Petitioner was Messer's way to "shine" in his job.  *Id.*, p. 209, 214-215.  The argument was that Petitioner had to do what a correctional officer told him to do, and while Messer denied previously doing favors for Petitioner, "what was he [Messer] gonna say, ladies and gentlemen?"  *Id.*, p. 211.

Petitioner has still not identified the purported witnesses by name.  Moreover, testimony from witnesses as to prior illegal dealings between Petitioner and Messer

---

[9] Also, "refusal may have impeded defense counsel's ability to inform the petitioner of the benefit, if any, that a plea of guilty or nolo contendere might have on the petitioner's sentence," thus resulting in prejudice.  *Id.* (footnote omitted).  This is not implicated here, where Petitioner claimed he needed a continuance to obtain additional witnesses to support his entrapment defense.

would not have shown that Petitioner was wrongfully induced to commit this crime or lacked the predisposition to do so.  Indeed, it may well have defeated the entrapment defense.  *See*, Ex. B, pp. 227-230 (jury instructions regarding entrapment defense).[10]

**Ground Two**

In ground two, Petitioner claims that he was never advised of his right to self representation when he sought to discharge counsel, a trial error claim.  Doc. 1, pp. 4-4A.  This is a claim of trial error.  Petitioner claims that he raised this claim in his state petition for writ of habeas corpus *as an ineffective assistance of appellate counsel claim* (doc. 1, p. 4A), which is obviously not the same claim, though it depends upon the underlying trial error claim.

Respondent construes this as a claim that counsel was ineffective for failing to assert on appeal the failure to advise him of his right to self representation at trial.  Doc. 10, p. 15.  Respondent concedes "the claim" is exhausted to this extent.  *Id.*, p. 15.  Respondent asserts that the state court rejected this claim as counsel is not ineffective for failing to raise a meritless issue on appeal.  *Id.*, pp. pp. 17-18 referencing Ex. I (response to petition filed in state court).  In effect, therefore, Respondent has addressed both the ineffective assistance of appellate counsel claim, which is not raised

---

[10] The jury was instructed that Petitioner first had to prove inducement or encouragement to commit the offense by the greater weight of the evidence, then the burden would shift to the State to prove beyond a reasonable doubt his predisposition – existing prior to and independent of the inducement or encouragement – to commit the offense.  *Id.*, pp. 229-230.  While it might have allowed Petitioner to prove inducement (by damaging Messer's credibility), demonstrating that Petitioner and Messer had an ongoing business for Messer to transport marijuana into the facility would also tend to prove Petitioner's predisposition to commit the crimes of bribery and possession of contraband in the form of currency.

in ground two, and the underlying trial error claim.  It is unnecessary to deal precisely

with this muddle as the merits may be addressed to deny a claim despite a lack of

exhaustion.  Whether a trial error claim or a claim of ineffective assistance of appellate

counsel, ground two is without merit.

The state court habeas corpus petition is Ex. G.  Citing Florida cases, Petitioner

argued that in ruling on his motion to discharge counsel the trial court was required to

advise that the state would not be required to appoint substitute counsel if current

counsel was discharged, and to advise him of his right to represent himself.  Ex. G, pp.

2-6.  Appellate counsel's failure to raise this plain error, it was argued, constituted

ineffective assistance of counsel.

The State acknowledged the requirements Petitioner had mentioned, as dictated

by Hardwick v. State, 521 So.2d 1071 (Fla. 1988), approving the procedure set forth in

Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).  Ex. I (answer brief), pp 5-7.  But

the Florida Supreme Court in State v. Craft, 685 So.2d 1292 (Fla. 1996) held that a trial

court does *not* err in failing to inform a defendant of the option of self representation

absent an unequivocal request for self representation.  *Id.*, pp. 7-9.  The cases cited by

Petitioner in his petition all pre-dated Craft.  *Id.*, p. 9.  It was argued that the issue was

meritless, and appellate counsel was not ineffective in failing to raise a meritless claim

on appeal.  *Id.*  Petitioner replied that his case was distinguishable, that the continuing

nature of his request for discharge of counsel should have constituted an unequivocal

request for self representation.  Ex. J.

The petition was denied on the merits, without opinion.  Ex. K.  It is plain that the

court agreed with the State's argument that this was a meritless claim under state law,

and failing to raise a meritless claim could not constitute ineffective assistance of counsel.  As the Florida Supreme Court said in <u>Craft</u>:  "This Court has repeatedly held that only an unequivocal assertion of the right to self-representation will trigger the need for a *Faretta*[11]inquiry."  685 So.2d at 1295.

The Eleventh Circuit similarly has "repeatedly explained:"

[A] criminal defendant has both a constitutional right to representation by counsel and a constitutional right to self-representation.  To accommodate both of these rights simultaneously . . . the right to counsel "is preeminent over the right to self-representation because the former attaches automatically and must be waived affirmatively to be lost, while the latter does 'not attach unless and until it [i]s *asserted*.' "

<u>Marshall v. Dugger</u>, 925 F.2d 374, 376 (11th Cir. 1991) (emphasis in original), *quoting* <u>Stano v. Dugger</u>, 921 F.2d 1125, 1143 (11th Cir. 1991) and <u>Dorman v. Wainwright</u>, 798 F.2d 1358, 1366 (11th Cir.1986)).  *See also* <u>Jones v. Walker</u>, 496 F.3d 1216, 1229 (quoting this passage from <u>Marshall</u>).

In <u>Gamble v. Sec'y, Fla. Dep't of Corr.</u>, 450 F.3d 1245 (11th Cir.), *cert. denied*, __, U.S. __, 127 S.Ct. 510 (2006), the Florida petitioner claimed that the trial court should have held a <u>Faretta</u> hearing after his alleged attempt to dismiss trial counsel, and claimed that appellate counsel was ineffective for failing to raise this issue on appeal. The Eleventh Circuit found no valid <u>Faretta</u> claim because, as the Florida Supreme Court had found, the petitioner never indicated he wished to conduct his own defense. 450 F.3d at 1248-49.  The court noted that the ineffectiveness of appellate counsel was based on the claim that the petitioner was entitled to a <u>Faretta</u> hearing as a matter of *state* law, a claim based on dicta in <u>Hardwick</u>.  *Id.*, at 1250 and n. 4.  The court found no

---

[11] <u>Faretta v. California</u>, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

reason to question the Florida court's interpretation of state law, and said that federal law did not require the result urged as explained with respect to the <u>Faretta</u> claim.  *Id. See also*, <u>Blake v. State</u>, 972 So.2d 839, 845-846 (Fla. 2007), *cert. denied*, __, U.S. __, 128 S.Ct. 2442 (2008) ("[a] motion to discharge counsel does not automatically require a *Faretta* inquiry or notice of the right to self-representation. . . .  A *Faretta* inquiry is triggered only by an 'unequivocal assertion of the right to self-representation.'") (quoting <u>Craft</u>, also citing <u>Gamble</u>).

There is no showing of a <u>Faretta</u> violation, a state law violation, or ineffective assistance of appellate counsel for failing to raise this issue as a state or federal law issue on appeal.  The state court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law.

**Ground Three**

In ground three, Petitioner claims that he "was deprived of conflict free counsel," incorporating the facts set forth in support of ground two.  Doc. 1, p. 5.  In addition to his pro se motion to discharge counsel, Petitioner notes that counsel also submitted a motion to withdraw as he was from the same office (of the Public Defender) as the attorney he replaced.  *Id.*, pp. 5-5A. "To further bring out existing conflict," Petitioner asserts in his traverse that he "pursued official interaction with the Commission of Ethics, listing Jamie Spivey, Kevin Steiger, and Nancy Daniels in this case."  Doc. 13, p. 6, referencing Ex. A.  That exhibit includes the complaint filed by Petitioner, dated December 12, 2002, and a letter to Petitioner (dated December 20, 2002) returning the complaint as the Florida Commission on Ethics did not have jurisdiction.

Respondent argues that Petitioner's conflict of interest claim is barred as not raised on appeal, but could have been under Florida law.  Respondent also notes that the ineffective assistance of appellate counsel for failing to raise the claim on direct appeal (raised in the second state habeas petition) was procedurally barred.  Doc. 10, pp. 20-22.

As noted above, Petitioner's second motion to discharge counsel sought to discharge the Office of the Public Defender.  Ex. A, pp. 121-160 (pro se motion with exhibits A-Q).  He made complaints regarding his representation by Spivey, who was replaced by Steiger, both from the Public Defender's office.  After the hearing prior to jury selection, the motion was denied.

Petitioner first asserted ineffectiveness of appellate counsel for failing to raise a conflict of interest claim on direct appeal in his *second* state petition for writ of habeas corpus.  Ex. L, pp. 5-11 (specifically noting that the issue had not been raised in the prior petition).  Petitioner claimed that a conflict existed when Spivey was replaced by Steiger as both were in the Public Defender's Office, and referenced the Public Defender's motion to withdraw from the appeal as "prima facie evidence that a conflict of interest existed at trial, and so on appeal."  *Id.*, p. 8, citing Ex. A to Ex. L.  He asserted that "after a conflict was found," Steven Seliger was appointed to represent him on appeal.  *Id.*, pp. 9-10.  Petitioner claimed this "mere act of appointing 'conflict-free appellate counsel' should have been a red flag to appellate counsel of what

transpired below," and argued Seliger was therefore "duty-bound" to raise the conflict of interest claim on appeal.  *Id.*, p. 10.[12]

The second petition for writ of habeas corpus was ultimately denied under FLA. R. APP. P. 9.141(c)(5)(C), which authorizes dismissal of a second or successive petition. Ex. P.[13]

Petitioner next filed a Fla.R.Crim.P. 3.850 motion asserting that *trial* counsel had a conflict of interest from the beginning, through the trial and sentencing.  Ex. U, pp. 18-30.[14]  The state court rejected the claim, reasoning:

> Essentially, he claims both his trial counsel [Spivey and Steiger] were ineffective in their representation of him in this case.
>
> Unfortunately, Mr. Sanders has previously raised this issue on two prior occasions unsuccessfully.  In February and October of 2004, he file[d] habeas corpus petitions with the First District Court of Appeal asserting virtually the identical claims.  Both Petitions were denied.  Defendants may not seek relief by successive Rule 3.850 motions.[1]

---

[12] The motion to withdraw from the appeal filed by the Public Defender's Office (Ex. A to the second state petition (which is Ex. L to doc. 13)) stated that "this office cannot represent Sanders when he wishes to argue on appeal that his trial attorney, who is a colleague of appellate counsel in the same office, was ineffective.  Since the continued representation of Sanders presents at least an appearance of conflict in the Public Defender's Office, this court must allow the office to withdraw from representing him and direct that other counsel be appointed."  Motion to withdraw at p. 2, citations omitted.  Ineffective assistance of counsel is generally not a viable claim on appeal (as noted *infra*), so while this may have raised an *appearance* of conflict, it was not a "red flag" for a direct appeal.

[13] The first order erroneously referenced 9.141(c)(5)(D), which pertains to an order granting a belated appeal.  Ex. N.  On Petitioner's motion, rehearing was granted and the petition was denied under 9.141(c)(5)(C).  Exs. O and P.

[14] Ex. U is the record on appeal; references are to the page number of the composite rather than to the page number of the 3.850 motion.

[1] While the prior <u>habeas</u> petitions were not brought under Rule 3.850, the District Court of Appeal was required to review them for sufficiency and merit and treat them as postconviction relief motions, even if Defendant invoked the incorrect, procedural vehicle.

Ex. U, p. 249.

A belated appeal from this order was granted, and Petitioner argued that his claim was not successive as it had never been decided on the merits.  Exs. CC and DD. The state was directed to respond only on another issue raised in the 3.850 motion – ineffective assistance of counsel for conceding Petitioner's guilt – and argued that even if not successive, the claim was facially insufficient.  Ex. GG.  The judgment was affirmed and rehearing denied.  Exs. HH-KK.

These are different claims.  One is that appellate counsel Seliger, who is not alleged to have operated under a conflict of interest, was ineffective on direct appeal for failing to raise the conflict of trial counsel.  The other is that attorneys Spivey and Steiger, both Assistant Public Defenders, operated under an actual conflict of interest throughout trial and sentencing.  Petitioner attempted to raise the claim regarding Seliger (ineffectiveness of *appellate* counsel) in his second petition for writ of habeas corpus, which was summarily denied as successive.  Petitioner asserted that it was not successive as it was not raised before, but the rule provides that a second or successive petition may be dismissed "if it does not allege new grounds and the prior determination was on the merits, or if a failure to assert the grounds was an abuse of procedure."  FLA. R. APP. P. 9.141(d)(5)(D). This was an independent and adequate state ground, and Petitioner has not shown cause for his failure to raise the claim of ineffective assistance of appellate counsel in his first state court petition.

As previously noted, doc. 14, p. 5, n. 2, the trial court's rejection of the actual conflict of interest by *trial* counsel claim as successive was an independent state law ground but may not have been adequate to support the decision.  Seliger's failure to raise conflict of interest on appeal (an ineffective assistance of counsel claim, not usually cognizable on direct appeal because dependent upon facts outside the record), is not the same as a claim of ineffective assistance of Spivey and Steiger due to a conflict of interest. *Cf*. Lawrence v. State, 969 So.2d 294, 313 (Fla. 2007) (question whether court should have sua sponte ordered a competency hearing, which was raised on appeal, was "an entirely different legal question than whether defense counsel should have requested the hearing.").  An ineffective assistance of counsel claim, including ineffectiveness due to conflict, is properly raised by a Rule 3.850 motion rather than by an appeal.  Bruno v. State,  807 So.2d 55, 63 (Fla. 2001) (as a rule, a defendant "*can only* raise an ineffectiveness claim via a rule 3.850 motion, even if the same underlying facts also supported, or could have supported, a claim of error on direct appeal," finding that ineffectiveness assistance claim based on conflict of interest should not have been dismissed as procedurally barred) (emphasis in original).  Indeed, in this case, the trial court repeatedly said at the time of trial that while a motion to replace counsel could be entertained, the trial court could not rule upon whether counsel was ineffective since that sort of claim had to come later (by means of a Rule 3.850 motion).  Here, however, perhaps the record of alleged conflict of interest might have been sufficient to raise the claim on direct appeal, as the Rule 3.850 court appears to have found.  But the fact that Petitioner pursued a related (but not the same) claim in a habeas petition –  which was never considered on the merits – should not have

precluded review, especially since a Rule 3.850 motion is routinely used in Florida to present such a claim.

But again, even if state remedies were not exhausted, this court may reach the merits to deny the claim.  That is the proper procedure here.  As noted above, Plaintiff argued in the first motion to discharge counsel that Spivey had provided ineffective assistance, and the motion was denied but a continuance was granted.  Steiger assumed Spivey's case load and in response to Petitioner's concerns about a conflict, Steiger filed a motion to withdraw, anticipating correctly that it would be denied.  The only potential conflict of interest evident on that record at that time was that both attorneys worked for the Public Defender and Petitioner had claimed that Spivey had been ineffective.  It was not a conflict of interest for Steiger to represent Petitioner even if his former attorney had been ineffective, even though both were from the Public Defender's office.  Of course, as Steiger told Petitioner, Steiger could not argue that Spivey's conduct constituted ineffectiveness of counsel.  Steiger *did* have a conflict of interest as to that claim.  But as Petitioner was told at the trial level, Spivey's effectiveness was not an issue that *any* attorney could raise at the trial level.  It was completely irrelevant then, especially since Steiger represented Petitioner.  There is no showing that Steiger's *relevant* performance was adversely affected by the alleged conflict of interest.  *See* Hunter v. Secretary, Dept. Of Corrections, 395 F.3d 1196, 1200-01 (11th Cir. 2005) (an actual conflict of interest must have adversely affected counsel's performance before relief will be granted, with the sole exception of those cases where a trial court improperly requires joint representation of co-defendants over

a timely objection) (collecting cases, including Strickland).  In summary, Petitioner's claim of conflict of interest is completely unsupported.  Ground three affords no relief.

**Ground Four**

In ground four, Petitioner claims that he was wrongfully forced to choose between the right to a fair trial and the right to a speedy trial, incorporating the facts in support of grounds two and three.  Doc. 1, p. 5.  He also claims that he filed a pro se notice of expiration of the speedy trial time, but his notice was a nullity as he had counsel.  *Id.*, p. 5A.  He alleges that "[c]ounsel was unable to adopt petitioner's position, as he was unprepared for a trial due to previous counsel's lack of preparation of the petitioner's case."  *Id.*  In other words, Petitioner claims Steiger could not pursue a speedy trial because Spivey had not sufficiently prepared for trial.  This is read as a claim of ineffectiveness of counsel.

Petitioner's pro se motion for discharge complained that the 175 day period of Fla.R.Crim.P. 3.191 expired around November 25, 2001, that he filed a notice of expiration of speedy trial on December 24, 2001, and since he was not brought to trial in 15 days he was entitled to release.  Ex. A, pp. 50-51.

Respondent does not assert a procedural default as to this claim.  Doc. 10, p. 24.  Respondent claims that Petitioner's pro se notice of expiration of speedy trial time was a nullity because he was represented by counsel, and because counsel had waived the 175 day requirement by asking for a continuance.  *Id.*, p. 25.  Respondent contends that the Florida speedy trial rule is not a constitutional right, so counsel's failure to demand a speedy trial did not result in denial of the constitutional right to speedy trial.  *Id.*, pp. 26-27.  Respondent claims that had counsel filed a notice of the expiration of time it would

have constituted a demand for trial in 15 days, counsel would have been unprepared for trial, and there is no indication that the State could not have successfully tried Petitioner in that time period. *Id.*, pp. 27-28. Further, counsel may waive the Florida time limits even against his client's wishes. *Id.*, p. 28, *citing* Randall v. State, 938 So.2d 542 (Fla. 1st DCA 2006).

When a criminal defendant in Florida is represented by counsel, the only pro se filing not treated as a nullity is one that makes a clear and unequivocal statement that the defendant wishes to discharge court appointed counsel. Logan v. State, 846 So.2d 472, 475-479 (collecting cases, noting that generalized claims of dissatisfaction are insufficient, defendant must make a "clear statement . . . that he or she wishes to discharge court-appointed counsel due to counsel's perceived ineffectiveness."). *See also* State v. Craven, 955 So.2d 1182, 1183 (Fla. 4th DCA 2007) (noting this rule, rejecting argument that the state must move to strike before pro se pleadings are considered nullities). Defense counsel may adopt and argue a pro se filing, but adoption of a pro se speedy trial pleading does not "relate back" to the time of its filing; the 15 day recapture period runs from the date counsel adopts the pro se pleading. 955 So.2d at 1184.

Petitioner's pro se notice of expiration of speedy trial and final motion for discharge (ex. A, pp. 5-6, 50-51) were ineffective, but his pro se motion to discharge counsel prompted a hearing. At that hearing, Petitioner complained about counsel. The court found there to be a communication problem and that counsel should be allowed additional time. Ex. A, pp. 72-78. The court specifically asked Petitioner about putting the trial off, that it was his choice, and Petitioner said "[i]t's not like I am going anywhere,

sir." *Id.*, p. 78.  Spivey was ultimately replaced by Steiger, who needed additional time, but Petitioner also wanted additional time even on the day of trial.  *See supra*, ground one (discussing request for continuance made the morning of trial).

The only conceivable reason either Spivey or Steiger would have adopted Petitioner's pro se motions and demanded a speedy trial would have been to trigger the State's 15 day recapture, hoping the State could not be ready for trial in that time.  But the prosecution clearly could have gone to trial, and almost immediately after arrest, with the audiotape and testimony of correctional officers.[15]  Rather than being discharged due to the delay, Petitioner and counsel would have gone to trial unprepared.  *See also* Ex. B, p. 20 (court commenting that "the speedy trial thing is not ineffective for not making it because it wasn't about to be granted.").  It was objectively reasonable for counsel to take the time to gather evidence and pursue an entrapment defense, even if Petitioner wanted to demand a speedy trial.  *See* Randall v. State, 938 So.2d at 544 (collecting cases).  *See also*, Taylor v. State, 557 So.2d 138, 141-142 (Fla. 1st DCA 1990) (noting tension between right to speedy trial under state statute and constitutional right to competent, prepared counsel; finding no violation of the constitutional right to speedy trial where counsel sought a continuance over defendant's objections), *overruled on other grounds;*[16] and Jones v. State, 449 So.2d 253, 262

---

[15] This was not a case where a crime (such as murder) is committed and the prosecution must gather physical evidence to show that the accused committed it.  This was a sting operation and the transaction was simultaneously recorded on audiotape.  By the time the offense was completed, there was evidence available to the prosecution to show that it was committed by Petitioner.

[16] Taylor was disapproved to the extent inconsistent with the opinion in Heuss v. State, 687 So.2d 823 (Fla. 1996) (holding that state's failure to argue harmless error

(Fla.), *cert. denied*, 469 U.S. 893 (1984) (defendant may not control the docket by making spurious demands for a speedy trial he is not prepared for) (citations omitted). The continuance helped the defense.  No attorney error or prejudice is shown.

**Ground Five**

In ground five, Petitioner claims ineffective assistance of counsel for failing to prepare for trial.  Doc. 1, p. 5A.  Respondent does not assert a procedural bar in response to this ground, comprised of several ineffectiveness claims.  Doc. 10, p. 29.

First, Petitioner claims that his "ultimate counsel" (Steiger) was not aware that the state had two video tapes as part of the case against Petitioner.  Doc. 1, p. 5A. Petitioner alleges that when Steiger became aware of this at trial, he argued that the state violated discovery, and the state pointed out that the defense never asked for the other tape and assumed the state would not use it.  *Id.*  Petitioner claims "[t]here were major differences between the two tapes that petitioner had based his defense on the tape that he had viewed, where there had been no mention whatsoever of any contraband for which the petitioner had been charged."  *Id.*  Respondent also references this as a videotape.  Doc. 10, p. 30.  The record does not reflect there was ever as *video*tape, however.

An audiotape entitled "Electronic recorded conversation between Inmate Sanders and Officer Messer" was identified by Officer Messer.  Ex. B, p. 67.  Out of the presence of the jury, Steiger argued that the tape provided to Spivey, that they had listened to and thought would be introduced at trial, was the tape taken from a remote location.  *Id.*, p.

_____

does not preclude appellate court from considering it).

68. He said they were never given the "body bug tape" worn by Messer, and did not expect it would be played at trial.  *Id.*  The prosecutor explained that it came up in deposition that there were two recording devices.  *Id.*, p. 69.  One was an electronic intercept device which operated by radio frequency, so you could hear other voices and comments by people watching the transaction.  *Id.*, pp. 69-70.  The other was a micro-cassette used for surveillance and played in the presence of the officer.  *Id.*  They were of the same conversation, but the former "was like an open mic thing," with voices other than the conversation at issue.  *Id.*, p. 70.  There was argument over whether the prosecution could use the micro-cassette "body bug" tape since Petitioner had only heard the other one.

The defense investigator told the court that there were two tapes, a regular cassette and a micro-cassette, he recorded both on one tape and took them to Petitioner.  "He only heard the one because the other one was the same thing."  *Id.*, p. 72.

Steiger wanted the other tape (from the remote location) played, and reserved the right to play it.  *Id.*, p. 73.  The court said: "Well, like I said, you could present whatever evidence you want and there may be something on there that's helpful to you, which is fine."  *Id.*  The "body bug" tape was played to the jury and transcribed in the record.  *Id.*, pp. 73-80.

DOC Inspector Anthony Marrotta testified that they used a mini-cassette recorder that was put in Messer's pocket with a microphone taped to his body, and they had a regular cassette recording what was broadcasted back to where the other officers were stationed.  *Id.*, p. 107.  They did not have a video camera running.  *Id.*, p. 110.  The

second recording included the voices of the officers commenting about what was

happening.  *Id.*, p. 114.  Marrotta identified the second recording, and it was played to

the jury and transcribed in the record.  *Id.*, pp. 114-129.  It included the conversation

between Petitioner and Messer, and the commentary by officers listening to it, including

comments about Messer's character.  *Id.*, p. 121-122.[17]

The tapes were both of the same transaction.  Petitioner claims that there was

prejudice, "as the tape he and counsel had reviewed which the defense was based on

*contained no mention of any contraband.*"  Doc. 13, p. 10 (emphasis by Petitioner).

Both tapes were played for the jury, and both included Messer asking if he had the

money, and Petitioner responding he would go get it.  Ex. B, pp. 76, 118.  There were

differences.  On the "body bug" tape, Messer said[18] he had lost "that damn paper" and

could not remember the prisoner that Petitioner wanted moved, and Petitioner said:

"Joel Rodriguez.  I only got one $100 bill . . . ."  *Id.*, pp. 75-76.  Then Messer asked if

---

[17] One officer said "I know Messer is not the cleanest officer around, but he came
through on this one," and the other officer responded that in a secured unit, "[y]ou know
what you have had to do – to make true to keep peace in the place."  *Id.*, p. 121.  The
first officer responded that he was "not talking about the physical part," and the second
asked "he has done another thing?"  *Id.*, pp. 121-122.  "Well his brother, more than him
– the physical – oh, yeah, there is no doubt in my mind, but, yeah, you are right you
have got to do certain things. . . . [H]is brother is the one that – word has got back that
he has brought in drugs and booze . . . And the sad part about it is his brother is a damn
good officer, but he is dirty.  This kid is a good officer, but he likes to knock the shit out
of them."  *Id.*, p. 122.  Both agreed they would "rather have a robocop" officer, and one
said "the Messers usually have a good reputation with the inmates, especially the white
inmates."  *Id.*

[18] The voices are "unidentified" in the transcript.  The jury would have been able
to hear differences between the two voices.  The identity of the speakers here is
inferred from the context of what was said and Messer's purpose going into the
transaction with the "body bug" on and with other officers listening to the transaction.

Petitioner had it, Petitioner asked if he meant the piece of paper, and Messer said "the money" and Petitioner said he would go and get it.  *Id.*, p. 76.  The court reporter's transcription of the second tape differs, probably due to the fact that other voices were being recorded.  When Messer said he had lost "that damn paper," the only thing recorded as said by Petitioner on the second tape is "Joel Rodriguez" without mention of $100, but this is followed by a note that something was not audible to the court reporter.  *Id.*. p. 118.  The second passage, however, is essentially the same as the "body bug" tape.  Messer asked whether Petitioner "got it," Petitioner asks if Messer means the piece of paper, and Messer says "the money," Petitioner says "yeah," and Messer says "go get it," and Petitioner says "all right."  *Id.*

Money was the contraband and the defense was based on entrapment, not the absence of contraband.  *See, e.g.*, Ex. B, pp. 50-53 ("[w]hat the case is really about is it's about entrapment, as I indicated in my voir dire."); 205-216 (defense counsel's opening and closing arguments).  Obviously it would have been better for the defense if the State had only played the surveillance tape, which was less complete because it included the other voices on it, to cast some question on Messer and distract from the conversation at issue between Petitioner and Messer.  But even if counsel was not aware of the "body bug" tape and that this was somehow deficient performance, there can be no prejudice to the outcome.  Both tapes were presented to the jury.  There was no videotape.  Petitioner has not shown that had his lawyer had known of the "body bug" tape, he could have done anything  differently at all to have it excluded from evidence.

Petitioner next argues that counsel "did not even depose the State's key witnesses."  Doc. 1, p. 5A.  He claims Spivey scheduled depositions but they were never taken, and "[t]hese key witnesses were the ones in which the State's entire case was based upon."  *Id.*  Petitioner does not identify any "key witness" by name.

Respondent responds by looking to the state post conviction motion, in which Petitioner identified Herbert Messer and Noel Mercer as the witnesses.  Doc. 10, p. 31.  Both, it is argued, were deposed.  *Id.*  Petitioner included with his Rule 3.850 motion an exhibit setting forth information taken from the depositions of Messer, Mercer, and other witnesses.  Ex. U, pp. 200, 202.  In cross examining Messer, counsel referenced prior statements made at Messer's deposition and in his affidavit.  Ex. B, pp. 84-89.  He also cross examined Mercer, though without reference to his deposition.  *Id.*, pp. 142-144.

In his traverse, Petitioner does not disagree that these depositions actually took place.  *See* doc. 13, pp. 9-10 (addressing Respondent's arguments as to ground five).  The claim, therefore, is contradicted by the record.  Messer and Mercer were deposed.  But even if not deposed, Petitioner fails to show what would have happened differently had the witnesses been deposed.  The claim is insufficient on its face.

Petitioner next claims counsel was ineffective as he:

never moved for suppression for authenticity where no chain of custody had been accounted for where even the State had not possessed or reviewed the tapes within over a year from supposed filming, and for authorization to conduct a sting type operation.

Doc. 1, p. 5B.  Petitioner's lawyer had a copy of the audiotape.  He submitted the original to an expert who evaluated it and found no tampering with the tape.  Ex. B, pp. 12, 18, 36-37.  The people who were there when the transaction was recorded did not

dispute that it reflected what transpired.  Petitioner has not identified a legal argument

which might have precluded introduction of the tapes, and has not identified error of

counsel or prejudice to the outcome.

The conclusory claim that there was no authorization for a sting operation is

similarly insufficient.  The wiring of the transaction was set up by a DOC investigator.

Ex. B, pp. 103-130 (testimony of Inspector Anthony Marrotta, regarding the investigation

he conducted with Senior Inspector Sam Pacchioli).  Controlled, monitored transactions

are frequently used to collect evidence for prosecution.  Petitioner has not identified

legal authorization which was lacking and would have precluded use of the evidence

obtained.

Finally, Petitioner claims ineffective assistance of counsel in jury selection, as

counsel:

> permitted three or four members (lack of recorded voir dire prevents an
> accurate number of either three or four) to be empaneled that had
> revealed their personal friendship with the State's key witness, Captain
> Noel Mercer, who had been the only witness at trial that had testified that
> he observed petitioner pass contraband to Officer Messer.

Doc. 1, p. 5B.  Respondent asserted that Petitioner has failed to identify the jurors or

indicate a precise basis for his challenge.  Doc. 10, p. 32.

This is the claim as to which the supplement was directed.  Doc. 14.  Respondent

filed the transcript of jury selection.  Ex. LL (doc 19-2 and 19-3 in ECF).  By traverse to

the supplement, Petitioner clarified that his claim is that jurors Rankin, Roddenberry,

and Jacobs were not challenged by counsel and were biased jurors.  Doc. 21.

Counsel used five of his six peremptory challenges (the prosecutor used two) on

the first group of jurors, then more prospective jurors were called for questioning.  Doc.

19, Ex. LL (transcript of jury selection), pp. 68-70[19] (doc. 19-3, pp. 23-26).  Counsel

used his last remaining peremptory strike.  The jurors allowed to remain on the jury now

challenged by Petitioner were from the second group.

Petitioner claims that counsel used his peremptory strikes on jurors who could

instead have been excused for cause, and he had unlimited challenges for cause.  Doc.

21, pp. 2-3.  Specifically, he claims that "basis for cause surely existed" as to Encalade,

a former police officer, and that Shoemaker and Causseax were "excellent candidates

for cause" as former officers at Liberty Correctional Institution.  *Id.*, p. 3.  Petitioner

claims that Anders (the juror removed from the second group, using the last peremptory

strike) was "another cause candidate," as she had worked at the institution for 14 years,

knew all the witnesses in the case, and was sure she must have handled Petitioner's file

though did not recall it.  *Id.*  Petitioner asserts that defense counsel never challenged

any jurors for cause.  *Id.*  He claims "it cannot be considered that deliberations did not

include personal knowledge by at least one of the complained of jurors," and there could

be no "sound strategy in permitting one-half the jury to decide the case as friends of the

State[']s key witness."  *Id.*, p. 4.

Petitioner claims that juror Sherry Rankin said she "went to school with Captain

Mercer, and had acquaintances afterward," but counsel for the defense and the state

failed to ask "if her acquaintance with Mr. Mercer would affect her, or if she could set

that aside and decide the case solely on the evidence before her."  *Id.*, p. 2 (referencing

---

[19] Numbers appear in the right margins of the transcript at apparent page breaks, and a different number appears at the bottom of each page.  Petitioner references the latter (*see* doc. 21, p. 2, citing p. 88), as does the court.

Ex. LL).  Petitioner asserts that jurors Roddenberry and Jacobs both said "I don't think

so" when asked if their relationship with Mercer would affect their view of the testimony,

and this does not satisfy the requirement to show impartiality.  *Id.*, p. 2.  He points out

that Roddenberry was never asked what relationship he had with Mercer.  *Id.*

At the beginning of jury selection, the court told jurors to raise their hands if they

had negative responses to any questions; otherwise agreement would be assumed.  Ex.

LL, p. 3 (doc. 19-2, p. 4).  The prosecutor advised that if someone had a response to

raise their hand and they would talk about it.  *Id.*, p. 21 (19-2, p. 22).  Steiger explained

that there needed to be a free give and take, to help them decide who should and who

should not be on the jury.  *Id.*, p. 46 (doc. 19-3, p. 2).  "If I say anything that pricks your

ears or anything like that and you feel like, well, I would like to respond to that, or – go

ahead. . . . [Y]ou are the people we want to know about."  *Id.*, p. 47 (19-3, p. 3).


The transcript reflects that counsel asked Rankin if Mercer was "a friend or just

an acquaintance," and she replied that "we went to school together and an

acquaintance afterwards, but there is no social gathering with us."  Ex. LL, page 88

(doc. 19-3, p. 44 in ECF).  When asked whether he knew any of the officers,

Roddenberry said "Captain Mercer."  Ex. LL, p. 88 (doc. 19-3, p. 44).  Asked if there

was "anything about that relationship that will affect how you'd view his testimony here

today," he answered "I don't think so."  *Id.*  Jacobs said he knew Mercer and counsel

asked "is he a friend of yours or just a guy you know?" *Id.*, p. 87 (doc. 19-3, p. 43).

Jacobs responded "I know him really well.  And I'd say a friend, too."  *Id.*  Counsel

asked if there was "anything about that relationship that would affect how you'd view the evidence in this case," Jacobs said "[n]o, I don't think so."  *Id.*

Having posed similar questions to the first group, counsel asked the new group of prospective jurors:

> MR. STEIGER:  Did all of you agree that law enforcement – corrections officers are human just like the rest of us and are subject to the same foibles as the rest of us?  None of you are going to say, Well, that guy is in a brown uniform.  I'm going to believe him because he is in that brown uniform?
>
> *Ms. Rankin, I could see you don't, but you don't believe that they are necessarily telling the truth.  Can all the rest of you agree to that?*
>
> UNIDENTIFIED PROSPECTIVE JUROR: Yes.

*Id.*, at page 89 (doc. 19-3, p. 45 in ECF) (emphasis added).

It is clear that Rankin indicated that she would not believe a "guy in a brown uniform" just for that reason.  There is no indication that anyone else had a different view.  In other words, none of the jurors said that they would believe a correctional officer just because he was a correctional officer in uniform.

Due process requires that "the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment."  Morgan v. Illinois, 504 U.S. 719, 727, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992), *citing* Turner v. State of Louisiana, 379 U.S. 466, 85 S.Ct. 546,13 L.Ed.2d 424 (1965) (other citation omitted).  "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."  379 U.S. at 472-473, 85 S.Ct. at

550.  "The constitutional standard that a juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court is a question of federal law; whether a juror can in fact do that is a determination to which habeas courts owe special deference."  Patton v. Yount,  467 U.S. 1025, 1037, n. 12, 104 S.Ct. 2885, 2891, n. 12, 81 L.Ed.2d 847 (1984) (citations omitted).  In Yount, the petitioner sought habeas relief claiming that the jury was not impartial due to adverse pretrial publicity surrounding his first trial, though the second trial was held some four years later.  Id., at 1032, 104 S.Ct. at 2889.  The fact that the majority of prospective jurors remembered the case, "without more, is essentially irrelevant.  The relevant question is not whether the community remembered the case, but whether the jurors at Yount's trial had such fixed opinions that they could not judge impartially the guilt of the defendant."  Id., at 1035, 104 S.Ct. at 2891 (citation omitted).

"Counsel's actions during voir dire are presumed to be matters of trial strategy." Miller v. Francis, 269 F.3d 609, 615-616 (6th Cir. 2001) (citing Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001), other citations omitted); Gardner v. Ozmint, 511 F.3d 420, 426 (4th Cir. 2007), pet. for cert. filed May 29, 2008 ("[o]n habeas review, federal courts generally accord 'particular deference' to the judgment of trial counsel during voir dire.") (also citing Hughes).  The petitioner in Gardner claimed ineffective assistance for failure to use a peremptory strike (after a challenge for cause was denied) on a juror who admitted that "to a certain extent" she formed an opinion about the case from television coverage.  511 F.3d at 425.  She said she would try to be impartial and felt she could be open minded, though "as far as 100 percent" she could not say.  But when asked if she could render a fair and impartial verdict, she said she felt certain that she

could.  *Id.*, at 425-426.  After a challenge for cause was denied, counsel did not use a

peremptory strike.  *Id.*  The Fourth Circuit found this was a tactical decision which easily

fit the objective standard of reasonableness under Strickland.  *Id.*  The court also found

no showing of prejudice, *i.e.*, no showing that counsel's actions resulted in the seating of

a biased or prejudiced juror.  *Id.* (citation and footnote omitted).  *See also* Carratelli v.

State, 961 So.2d 312, 324 (Fla. 2007) (holding that where defendant claims ineffective

assistance of counsel for failing to raise or preserve a cause challenge to a prospective

juror, he must defendant must show the juror was actually biased). Cage v.

McCaughtry, 305 F.3d 625, 626-627 (7th Cir. 2002).[20]

Even if counsel could have excused the three identified jurors – either by

challenging others for cause or seeking additional peremptory strikes – Petitioner has

not shown ineffective assistance for failure to do so.  The prospective jurors said that

while they knew Mercer, they thought that would not affect them and that they would not

necessarily believe the word of a correctional officer.[21]  The failure to excuse them was

objectively reasonable, and there is no showing that any of these jurors could not (or did

---

[20] There the court found it had erred in granting a certificate of appealability
where the issue was essentially whether the court should sua sponte dismiss a juror for
cause absent objection by counsel, as neither the Supreme Court nor any other court it
had found had ever declared such a rule.  *Id.*, at 626.  The absence of such a rule was
"not surprising."  *Id.*  The court thought "nothing suspicious about a lawyer's refusing to
strike a prospective juror for cause," as he "might feel that on balance the juror was
more likely to vote for than against his client."  *Id.*, at 626-627.  Noting counsel's
reasoning for keeping the juror, the court said, "[c]orrect or not, this is the kind of
reasoning that a criminal defendant wants his lawyer to engage in."  *Id.*, at 627.

[21] Contrary to Petitioner's argument, it was Messer rather than Mercer who was
the critical witness.  The entrapment defense was argued that Messer set Petitioner up
to cover or make up for his own misdeeds.  The jury did not have to disbelieve Mercer
to find entrapment.

not) base their verdict solely upon the evidence presented and the instructions given by the court.

**Ground Six**

In ground six, Petitioner claims that Steiger was ineffective as he did not have time to prepare or confer with him on a theory of defense, such that "[w]hen petitioner proceeded to trial, counsel [conceded] his guilt by presenting an entrapment defense without authorization or approval of petitioner."  Doc. 1, p. 5B.

Respondent does not assert procedural bar as to this claim, which was considered on the merits in the belated Rule 3.850 appeal.  Doc. 10, pp, 33-34; Ex. F (directing response to whether this claim should be remanded for an evidentiary hearing), Ex. GG (response on issue of whether counsel was ineffective for conceding guilt without consent).  Respondent asserts that admitting facts and denying guilt by invoking an affirmative defense is not a concession of guilt.  Doc. 10, pp. 34-35.  *See also* Ex. GG , pp.7-10 and n. 7 (collecting Florida cases).

The claim is unsupported.  On this record, as discussed at length above, it is readily apparent that lack of time to further prepare or confer was *not* the reason counsel presented an entrapment defense.  Petitioner clearly knew this defense would be presented, and joined in the late request for a continuance to obtain additional witnesses to support it.  *See particularly* Ex. B, p. 26 (counsel explained, "Judge, our defense is entrapment.  It always has been;" Petitioner added, "[w]ith the witnesses I could prove that I was set up on this because of the other [transactions].").

Given the witnesses and an audiotape of the offense, assertion of an affirmative defense was a reasonable defense strategy.  "[I]f counsel's strategy, given the evidence

bearing on defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain."  Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (finding concession strategy was not equivalent to a guilty plea, and counsel was not ineffective for his concession that defendant committed murder but should be spared the death penalty).[22]

**Recommendation**

It is therefore respectfully **RECOMMENDED** that the § 2254 petition, challenging Petitioner's conviction out of the Second Judicial Circuit, Liberty County, case 01-CF-045, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on August 18, 2008.


s/     William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE



**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and**

---

[22] In Nixon, the Court found counsel's concession (at the guilt phase of trial) that defendant committed the murder was not the functional equivalent of a guilty plea; defendant "retained the rights accorded a defendant in a criminal trial," the state had to prove the elements of the offense, the witnesses were subject to cross examination, and counsel endeavored to exclude prejudicial evidence.  543 U.S. at 188, 125 S.Ct. at 560-561.  Counsel thought his best strategy was to concede guilt to keep his credibility with the jury for the sentencing phase.  *Id.*, at 181, 125 S.Ct. at 556.  Counsel explained this strategy "at least three times" to defendant but he was not responsive, and did not consent or object.  *Id.*

recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.